**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MONIQUE SPEIGHTS** | **CIVIL ACTION** |
| **v.** | **NO.  19-2343** |
| **ARSENS HOME CARE INC.** *d/b/a* **CAREGIVERS AMERICA** | |

**MEMORANDUM RE MOTION TO STRIKE DEFENDANT'S EXPERT REPORT AND WITNESS**

Baylson, J.                                                                    October 28, 2020

## I.   INTRODUCTION

In this employment case, Defendant has provided an expert report regarding Plaintiff's mitigation of damages.  The expert testimony can be distilled into two opinions: (1) Plaintiff did not conduct a reasonably diligent job search, and (2) if Plaintiff had conducted a diligent job search, she would have found a job in six months.  Before the Court is Plaintiff's Motion to Strike Defendant's expert report and witness testimony.  For the reasons that follow, the motion will be granted in part and denied in part.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Prior to her employment with Defendant Arsens Home Care ("Arsens" or "Defendant"), Plaintiff Monique Speights was employed as a Surgical Care Specialist, an OB/GYN Assistant, a Registered Medical Assistant, an Accounts Receivable Representative, and a Customer Service Representative.  (ECF 33, Ex. A, "Expert Report" 2.)  Arsens hired Plaintiff as a Registered Medical Assistant on February 15, 2015.  (ECF 42, Opp'n 1.)  Later, Plaintiff was transferred to the Human Resources Department where her title was "HR Assistant."  (Id.)  Plaintiff has alleged that she was fired for taking medical leave for reasons related to both her and her mother's health. See ECF 23, Am. Compl.  The date of Plaintiff's separation from employment with Arsens was

October 11, 2018.  (Expert Report 1.)  Plaintiff lives in Philadelphia and as of the date of the expert report had not secured a new job.  (Expert Report 2.)

Plaintiff brought this lawsuit for alleged violations of the Americans with Disabilities Act, the Family and Medical Leave Act, the Pennsylvania Human Relations Act, and the Philadelphia Fair Practices Ordinance.  See Am. Compl.  This Court previously considered Defendant's Motion for Summary Judgment, which was denied.  (ECF 50, 51.)  Defendant provided Plaintiff with an expert report setting forth proffered testimony by Chad Staller and Stephen Dripps of the Center for Forensic Economic Studies.  See Expert Report.  Plaintiff now moves to strike Defendant's expert report and witness testimony.  (ECF 33, Pl.'s Mot. to Strike "MTS" ¶ 1.)

## III.     THE EXPERT REPORT

The expert report begins by reviewing Plaintiff's job history, personal background, earning history, and job search efforts upon her termination from Arsens based on Plaintiff's deposition and responses to interrogatories.  (Expert Report 2-5.)  The report includes graphs charting Plaintiff's job contacts over time.  (Id. at 6.)  It also notes that Plaintiff did not apply for positions with several Home Health Agencies (the type of organization from which she was fired) and that she did not apply for Medical Assistant positions because she would have had to renew her credentials.  (Id. at 7.)  The next sections of the report detail the methods used by the experts to reach their conclusions.

### a.  Elements of a Reasonable and Diligent Job Search

First, the report describes the requirements for receiving unemployment benefits in Pennsylvania. Individuals must "apply for two jobs and conduct one work search activity per week" which the report states "serves as a reasonable proxy as to the minimum standard of a reasonable and diligent job search effort."  (Id. at 7.)  The report also references the resources

available from the Pennsylvania Department of Workforce Development to assist individuals looking for a job.  (Id.)  In applying this information to Plaintiff, the report states that Plaintiff "has not provided sufficient evidence that she has consistently met" the requirements for receiving unemployment, and that she had not "availed herself of any of the resources offered by the Department of Workforce Development."  (Id. at 7-8.)

### b.  Employment and Unemployment Statistics

The next section of the report reviews data from the Bureau of Labor Statistics regarding "the number of individuals employed in positions similar to" Plaintiff in the Philadelphia-Camden-Wilmington area as well as "[d]ata pertaining to the duration of unemployment experienced by individuals with similar characteristics to" Plaintiff.  (Id. at 8.)  The data regarding duration of unemployment includes the following categories of workers: "All Workers," "Full-Time Workers," "Women between Age 45 and 54," "Office and Administrative Support Occupations," and "Education and Health Services."  (Id.)

### c.  Potential Employment Opportunities

Lastly, the report reviews the number of "potential employment opportunities" as determined by a database called "Forensic JobStats."  According to the Forensic JobStats website, it is a database "used by government agencies and media companies in leading economic indicators and led by Malcolm Cohen who has a Ph.D. in economics from MIT and specializes in Econometrics and Labor Economics."  (Opp'n 7.)  It appears to be a database that compiles job postings from a variety of job posting websites.  The experts searched this database with a date range of Nov. 1, 2018 (shortly after Plaintiff's separation from Arsens) to Dec. 31, 2019 for jobs including "Medical Assistant," "Human Resources Assistants, Except Payroll and Bookkeeping," and "Medical Secretaries" in the "Philadelphia area" which includes Philadelphia, Delaware,

Montgomery, Chester, Camden, Burlington, Gloucester, and New Castle counties. (Expert Report 9.) The search identified nearly 11,500 job opportunities. (Id. at 10.) Comparing this number with the number of jobs to which Plaintiff applied, the experts find that Plaintiff's documented "job contacts represent scarcely more than 1% of available job opportunities." (Id.) Next the report notes specific categories of jobs for which Plaintiff did not apply including Medical Assistant jobs and employment with home health agencies. The experts also note that they would have concluded that there were even more positions that Plaintiff could have applied to had they included Customer Service Representative positions in their search. (Id.)

Using the number of "potential job opportunities" based on the Forensic JobStats search and the Bureau of Labor Statistics data, the expert report states that "it is reasonable to conclude that [Plaintiff] could have secured comparable employment within six months." (Id.) The report later stated "had [Plaintiff] conducted a reasonable job search subsequent to her separation from Arsens, she should have found full-time employment within a period ranging from ten weeks to, at most, six months." (Id. at 11.)

## IV.   LEGAL STANDARD

### d.  Fed. R. Evid. 702 and Daubert

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, "a trial judge acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (internal quotation marks omitted).  In this role, a trial judge must: "(1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it . . . will assist the trier of fact" also referred to as "fit." UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 832 (3d Cir. 2020) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993)).  The first requirement, that the expert be qualified, is not at issue here.

The second requirement, reliability, means the testimony must "be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (quotations omitted).  Courts consider the following factors when determining reliability:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

United States v. Mitchell, 365 F.3d 215, 235 (3d Cir. 2004).  This list is "neither exhaustive nor applicable in every case" but it "provide[s] a convenient starting point for analyzing" reliability. Kannankeril v. Terminix Int'l, 128 F.3d 802, 806-07 (3d Cir. 1997).  Further, parties do not need to demonstrate "that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." In re Paoli R.R. Yard Pcb Litig., 35

F.3d 717, 744 (3d Cir. 1994) (emphasis in original).  "As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process . . . rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  Mitchell, 365 F.3d at 244.

"Fit" means "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."  Schneider, 320 F.3d at 404.  "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  Daubert, 509 U.S. at 591 (citations and internal quotation marks omitted).

### e.  Fed. R. Evid. 704

Federal Rule of Evidence 704 states that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  However, the Advisory Committee Notes state that this Rule "does not lower the bars so as to admit all opinions" and it is still impermissible for an expert to "merely tell the jury what result to reach."  Put another way, "an expert witness is prohibited from rendering a legal opinion."  Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006).

### f.  Expert Testimony on Mitigation in Employment Cases

In Petrulio v. Teleflex Inc., No. 12-7187, 2014 WL 5697309 (E.D. Pa. Nov. 5, 2014), the District Court relied heavily on two unpublished District Court opinions from the Second Circuit: Roniger v. McCall, No. 97-8009, 2000 WL 1191078 (S.D.N.Y. Aug. 22, 2000) and Castelluccio v. Int'l Bus. Machines Corp., No. 09-1145, 2012 WL 5408420 (D. Conn. Nov. 6, 2012).  All three of these cases considered expert opinions regarding mitigation of damages in employment cases.

Petrulio considered several opinions rendered by an expert including two opinions which are relevant here: "(1) plaintiff has not conducted a reasonable and diligent job search to mitigate her loss by finding comparable employment" and "(2) if plaintiff had conducted a reasonable and

diligent job search she would have found a comparable position within 4-12 months."  2014 WL 5697309, at *15.

With respect to the first statement that the Plaintiff had not conducted "a reasonable and diligent job search" the Court found that this statement "would improperly substitute [the expert's] judgment for that of the trier of fact."  Id. (first citing Roniger, 2000 WL 1191078, at *5; then citing Castelluccio, 2012 WL 5408420, at *3).  In making the same point in Roniger, the Court stated that "[i]t would not be proper for [the expert] to testify as to whether Roniger's efforts to find comparable employment were 'reasonable' because this is an ultimate question in this case which is for the jury to decide based on all the evidence and this Court's instructions."  Roniger, 2000 WL 1191078, at *5.

However, in all three cases the Court also found that the experts could

> testify as to plaintiff's job search "to the extent that his testimony offers information that is relevant to the issue of [plaintiff's] mitigation and that lies outside the knowledge of a layperson."  Such testimony may include "the nature and degree of efforts which typify an average or successful job search[ ] . . . and how [plaintiff's] efforts compare to what are typical—or successful—efforts."

Petrulio, 2014 WL 5697309, at *15 (quoting Castelluccio, 2012 WL 5408420, at * 3) (alteration in original).  See also Roniger, 2000 WL 1191078, at *5.

Regarding the second statement that "plaintiff could have found comparable work within 4–12 months," the Court found that this statement was unreliable.  Petrulio, 2014 WL 5697309, at *16.  The expert's opinion was based, in part, on unemployment statistics from the United States Department of Labor's Bureau of Labor Statistics concerning "Management, Professional, and Related Operations."  Id.  The District Court again relied on Castelluccio, in which the expert admitted that "it was certainly possible that the Management, Professional, and Related Occupations category would lump together, for example, a 65,000 a year dental hygienist with a

CEO of a Fortune 500 or 100 company making 20 or 30 times that compensation." Id. (quoting Castelluccio, 2012 WL 5408420, at *4). Therefore, in Petrulio, as in Castelluccio, "the statistical data [the expert] relied upon to form his opinion . . . was not sufficiently pertinent to [plaintiff's] field to be considered reliable." Id. (quoting Castelluccio, 2012 WL 5408420, at *4).

In Roniger, the Court reached a similar conclusion regarding the expert's finding that the plaintiff should have found comparable employment within one year. 2000 WL 1191078, at *3. There the expert relied on two reports, one from a management consulting firm, and the other by the National Association of Business Economists. Id. The first study concerned "senior management and executive" positions, which the Court found unreliable because it did not differentiate based on profession. Id. The Court found the second study unreliable because it did not differentiate based on geographic area. Id.

## V.   PARTIES' CONTENTIONS

Plaintiff acknowledges that "[i]n virtually any type of employment case, an employee has a duty to mitigate" damages, but argues that this issue "is usually left to the good judgment of the trier of fact." (MTS 1.) Plaintiff relies heavily on the decision in Petrulio, and urges this Court to follow that ruling because some of the data relied upon by the experts here is the same as the data relied upon in Petrulio. Plaintiff raises several reliability issues with respect to the experts' use of Forensic JobStats, arguing that it does not take into account the distance from Plaintiff's home, the length of time jobs were posted, the reliability of job postings, and required experience for certain jobs. Plaintiff also argues that the expert report states that Plaintiff's job contacts constitute 1% of available jobs without any context or statement of what an appropriate percentage would be. Plaintiff does not challenge the experts' qualifications.

In response, Defendant argues that the expert report is reliable and helpful to a jury. Defendant distinguishes Petrulio stating that the expert in Petrulio did not include a description of what constitutes a reasonable job search against which he could have compared the plaintiff's job search.  Defendant also argues that the data relied upon by the expert report is more pertinent to Plaintiff's field than the data relied on in Petrulio.  Lastly, Defendant argues that the issues of reliability raised by Plaintiff are more appropriately addressed in cross examination and not by striking the report.

## VI.    DISCUSSION

The expert report ultimately comes to two conclusions: (1) Plaintiff did not conduct a reasonably diligent job search, and (2) if Plaintiff had conducted a diligent job search, she would have found a job in six months.

### a.    A Reasonable and Diligent Job Search

The admissibility of an expert opinion regarding whether a plaintiff in an employment case conducted a reasonably diligent job search is an issue addressed by the three District Court cases discussed above.  Petrulio, Castelluccio, and Roniger all held that it is proper for an expert to testify to "the nature and degree of efforts which typify an average or successful job search" and "how [a plaintiff's] efforts compare to what are typical—or successful—efforts," while also holding that an expert may not state that a plaintiff's search was not reasonable or diligent.  Petrulio, 2014 WL 5697309, at *15 (quoting Castelluccio, 2012 WL 5408420, at *3); see also Roniger, 2000 WL 1191078, at *5.

In this case, the experts use the requirements for receiving unemployment insurance in Pennsylvania as "the minimum standard of a reasonable and diligent job search."  (Expert Report 7.)  They then compare Plaintiff's efforts to this standard.  While members of a jury may have

experience looking for a job, they may not know what is typical or what would generally be considered diligent.  On this point, the experts' opinion may be helpful and is reliable.  Therefore, the experts may testify regarding Pennsylvania's standard for receiving unemployment and information regarding what constitutes a reasonable search.  However, the experts cannot state that Plaintiff did not conduct a reasonable and diligent job search because this would substitute their opinion for that of the trier of fact, as the District Courts in Petrulio, Castelluccio, and Roniger held impermissible.  Plaintiff's diligence is a highly-fact specific matter for the jury to determine.  By opining that Plaintiff was not diligent, the expert report comes close to improperly commenting on her credibility.  The experts' testimony is confined to reviewing Plaintiff's testimony and comparing it to an objective standard.  They may not comment on the ultimate issue of her diligence.

### b.  Plaintiff Should Have Found Work in Six Months

On the second issue, of whether the experts may testify that Plaintiff should have found a job in six months, the prior cases are less clearly controlling.  The expert report bases this opinion on two sets of data: unemployment statistics and a search of Forensic JobStats.

### i.  Unemployment Statistics

The expert report includes a table with data from the Bureau of Labor Statistics (BLS) regarding the duration of employment for certain categories of workers.  (Expert Report 8.)  Petrulio and Castelluccio found reliance on this type of data from the BLS was not specific to the plaintiffs' field.  In those cases, the plaintiffs were management or senior employees and the experts relied on BLS data regarding the duration of unemployment for all managerial positions, not specific to a field.  In this case, Plaintiff has held a number of administrative or entry-level jobs.  The categories of unemployment data relied on include "All Workers," "Full-Time

Workers," "Women between age 45 and 54," "Office and Administrative Support Occupations," and "Education and Health Services."  While "Office and Administrative Support Occupations" is a category that is more specific to Plaintiff's field, the other categories are notably broad.  It is unclear exactly what types of positions are included in "Education and Health Services," and "All Workers," "Full-Time Workers," and "Women between age 45 and 54" would certainly include a range of fields and levels of experience.  Further, the experts have provided no explanation of how they used these categories of data to reach their conclusion.

### ii.  Forensic JobStats

Next, the expert report includes a summary of "potential job opportunities" drawn from a search of Forensic JobStats, including almost 11,500 jobs.  Plaintiff has pointed to several issues concerning reliability of the data from Forensic JobStats.  First, that the geographic area included in the search of the database is too broad including counties in New Jersey and Delaware as well as counties in Pennsylvania outside of Philadelphia.  Second, that it does not take into account the length of time jobs were posted, pointing out that some were posted for just one day.  Third, that some of the job postings are unreliable.  Plaintiff notes that "Poster Not Listed" is the "Poster" of 1,957 jobs included in the list of "potential employment opportunities."  Lastly, that it does not take into account the experience required for certain jobs.  For example, the position "optometric assistant" appears eleven times on the list of "potential employment opportunities," which may be a position which requires experience in the optometry field.  In response, Defendant argues that these issues are more appropriately addressed on cross examination, and do not demonstrate the unreliability of the report.

Plaintiff also argues that the conclusions drawn from this data are not in context, because the expert did not state what percentage of the "potential jobs" Plaintiff should have applied to.

Defendant responds that Plaintiff misunderstands the report, and that the report does not "opine that because Plaintiff applied to only 1% of the available job opportunities means that Plaintiff did not mitigate her damages." (Opp'n 11.) However, the report does rely, in part, on the fact that there were job opportunities available, as demonstrated by the search of Forensic JobStats, to reach the conclusion that Plaintiff should have found work within six months.

Further, the report does not provide information regarding the reliability of this database. Defendant states that "Forensic JobStats is a database used by government agencies and media companies in leading economic indicators and led by Malcolm Cohen who has a Ph.D. in economics from MIT and specializes in Econometrics and Labor Economics." (Opp'n 7.) However, Defendant does not explain how the government or media companies use this information, or why that is relevant here. It also does not explain how this database was created or from where the information in the database is drawn. There is also no explanation of how the experts used the information from Forensic JobStats in reaching the conclusions that Plaintiff should have found a job in six months or how many jobs must appear in this database to support the conclusion that there were plentiful job opportunities.

### iii.  The Expert's Opinion

The expert report states:

> Based on our analysis of the available information regarding Ms. Speights' job search efforts, potential job opportunities, and relevant labor market data related to the median duration of unemployment and mean earnings, in our opinion, had Ms. Speights conducted a reasonable job search subsequent to her separation from Arsens, she should have found full-time employment within a period ranging from ten weeks to, at most, six months.

(Expert Report 11.) The Court will strike this portion of the expert report and testimony because the data relied upon regarding duration of unemployment and potential job opportunities is

unreliable and because the experts have not provided an explanation of how they used this data to reach their conclusion.

**VII.     CONCLUSION**

Plaintiff's Motion to Strike the expert report and testimony is granted in part and denied in part.  Testimony regarding what constitutes a reasonably diligent job search and how Plaintiff's efforts compare to that standard is admissible.  Testimony regarding the conclusion that Plaintiff's search was not diligent or that Plaintiff should have found a job within six months is not admissible. An appropriate Order follows.

O:\CIVIL 19\19-2343 Speights v Simplura Health Grp\19cv2343 Memorandum re Motion to Strike.docx